Filed 1/6/14  P. v. Trulove CA1/2
Opinion following rehearing

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JAMAL R. TRULOVE,<br><br>        Defendant and Appellant. | A130481<br><br>(San Francisco City and County<br>Super. Ct. No. SCN208898) |

Defendant Jamal R. Trulove appeals from his conviction of first degree murder, accompanied by a sentence enhancement, and possession of a firearm by a felon, for which defendant was sentenced to 50 years to life imprisonment.  In a previous unpublished opinion, we affirmed the judgment, except that we reduced the conviction to second degree murder.  We then granted defendant's petition for rehearing and received additional briefing from the parties.  On rehearing and reexamination of all of the issues, we reverse, based on one of defendant's several appellate claims, that being that he received ineffective assistance of counsel because his trial counsel did not take any action in the face of highly prejudicial prosecutorial misconduct.

Evidence presented at trial indicated the victim was an adult male whose body was found by police late at night lying in the street of San Francisco's Sunnydale housing project in July 2007, shot multiple times.  Although about two dozen people were in the area, only one person, Priscilla Lualemaga, came forward and indicated she had seen the shooting, from a bedroom window.  Her trial testimony was the only evidence, direct or circumstantial, that placed defendant at the scene.

1

Between her initial statements to police and her testimony at trial, Lualemaga changed her account in some significant respects, including stating with increased certainty that defendant was the shooter and admitting that, contrary to her preliminary hearing testimony, she had called her cousin on the night of the shooting to ask her defendant's name before identifying him as the shooter to the police. She largely attributed these changes to her fears of retaliation against her and her family from defendant's friends and family. She indicated her fears were alleviated by her voluntary entry, and the entry of other family members, into a witness protection program, as arranged by the district attorney's office; she also indicated that the relocation and isolation of her and her family in the program caused considerable hardships. There was no evidence of any threats or other actual danger presented by defendant, his friends, or his family to Lualemaga or her family, or of any reason for Lualemaga's entry into the witness protection program other than because of her own fears.

Lualemaga's uncorroborated testimony that she saw defendant shoot the victim was essential to the People's case. Therefore, the trial's outcome turned on the jury's view of the credibility of her testimony. In closing argument, the prosecutor pointed out that Lualemaga feared retaliation from defendant's friends and family, then repeatedly argued that Lualemaga should be believed because only someone certain defendant was the shooter would risk her life and others, and endure hardships in a witness protection program she was forced to enter, in order to testify against him. The prosecutor wove these points into the very fabric of her closing argument, going so far as to urge the jury to have the same "courage" as Lualemaga and find defendant guilty.

The prosecutor's arguments improperly relied on facts not in evidence; namely, that Lualemaga and her family members were in real danger of retaliation from defendant's friends and family, and compelled by that danger to enter the witness protection program. The impropriety of these contentions was particularly egregious because they implied a consciousness of guilt on defendant's part; and they likely persuaded jurors because they were made by a prosecutor whose office, the jury knew, had arranged for Lualemaga and her family members to enter the witness protection

2

program. Therefore, we conclude the prosecutor's reliance on the dangers Lualemaga allegedly confronted constituted prejudicial misconduct, whether evaluated under the federal or state standard.

Defendant's trial counsel did not object to this misconduct, address it in his closing argument, nor request that the trial court give any related admonitions or limiting instructions to the jury. Therefore, although defendant has forfeited his appellate claim of prosecutorial misconduct by this inaction, he also received ineffective assistance of counsel. We reverse on this basis.

## BACKGROUND

In June 2009, the San Francisco County District Attorney filed a two-count information against defendant charging him with the willful, deliberate, and premeditated murder of Seu V. Kuka in violation of section 187, subdivision (a),[1] accompanied by an enhancement allegation that he personally and intentionally discharged a firearm causing great bodily injury and death within the meaning of section 12022.53, subdivision (d), and with possession of a firearm by a felon in violation of section 12021, subdivision (a)(1). A jury trial commenced in January 2010. We summarize the evidence and proceedings relevant to our resolution of this appeal.

### The Prosecution's Case

#### Police Discover the Body of Seu V. Kuka

On July 23, 2007, approximately 10:49 p.m., San Francisco police officers heard gunshots from the area of the Sunnydale housing project (Sunnydale). They received a dispatch that shots had been fired on Blythedale Avenue in Sunnydale and arrived at the scene at 10:51 p.m. They were waved down by people in the area and found the body of a man lying on the ground. The pulseless body, dressed in jeans, shirtless, with a jacket lying across the waist, appeared to one officer to have been moved; there were gunshot holes in the chest and face, and blood beside the head. Everyone in the crowd around the

---

[1] All statutory references herein are to the Penal Code unless otherwise stated.

3

officers denied seeing anything that occurred. There were no weapons around the body, and no murder weapon was ever found.

### The Testimony of Priscilla Lualemaga

Priscilla Lualemaga was the sole testifying eyewitness to the shooting, and the prosecution's key witness. She said that at the time of the shooting, she stayed at her grandmother's apartment on Blythedale Avenue (Blythedale apartment) during the week because it was closer to her work. She did not know or socialize with people in the neighborhood.

About two months before the shooting, Kuka moved in next door to Lualemaga, at which time Lualemaga learned he was her distant relative. Lualemaga's father had a half sister, Lualemaga's aunt, who told Lualemaga the aunt was a half sister of Kuka, although the aunt had never met him.

Lualemaga noticed that Kuka spent time with defendant, who she saw approximately 30 times before the shooting. She also noticed that they spent time with a man whose name she did not know, identified at trial as Joshua Bradley, defendant's brother. At the time of the shooting, Lualemaga said she did not know that defendant and Bradley were related.

According to Lualemaga, she returned home on the day of the shooting around 3:00 p.m. and saw Kuka, defendant, and Bradley drinking in front of the building. About 11:00 p.m. that evening, as she prepared for bed, she heard yelling, a slapping or hitting sound, and a man yell something like, "I'm going to get you." She pushed aside the shade of a bedroom window and looked out over a board that covered part of the window. She saw a shirtless Kuka looking "very angry" and chasing Bradley, with dozens of people watching. Both men ran very fast; Bradley ran to Lualemaga's car, which was parked by a light pole, and ran around the car. She could see their faces clearly at that time, even though it was nighttime.

Lualemaga testified that Kuka, as he ran around Lualemaga's car chasing Bradley, bumped into defendant, who "was kind of in his way." Kuka elbowed defendant "really

4

hard" with his right arm, causing defendant to fall down, and ran down a hill after Bradley. Lualemaga could see defendant's face clearly. She was sure it was defendant.

Lualemaga said defendant got up "fast" and ran after Kuka. When he was right behind Kuka, defendant, whose face Lualemaga saw clearly, shot Kuka "two times, maybe" in the back before Kuka fell to his knees, and then kept shooting Kuka in the back maybe four or five more times. She was unsure how many shots were fired because it "happened so fast." She did not see a gun, but saw defendant holding his hand out like he was holding one, saw flashes, and heard gunshots. Defendant ran around a building as Kuka remained on the ground, face down. Lualemaga did not see that Kuka had any weapons. Bradley was not with Kuka when he was shot, and Lualemaga could not see him. About 25 people were outside and they tried to back away when the shooting occurred.

According to Lualemaga, defendant was wearing black jeans, a black, hooded pullover sweater, and a white T-shirt. At trial, she said the hood was down. However, she acknowledged that she had said at the preliminary hearing that she could not remember whether it was up or down that night.

Lualemaga further testified that she went outside when the police arrived and indicated to them that she had seen what had happened. They took her to the Ingleside police station and put her in a room that had "mug shots of individuals hanging on a wall." A police officer told Lualemaga to look through the mug shots; Lualemaga "kind of scanned through" them and identified one as the person Kuka was chasing, Bradley.

Lualemaga further testified that she did not recall defendant's name as of the night of the shooting, although she knew him by face. After she returned home that night, she called a cousin and asked her the name of the "guy" they had talked to a couple of weeks before, and her cousin said it was "Jamal."

Lualemaga said police came to her work place the next day and showed her a lineup card with six photographs. She identified one as the man Kuka was chasing and another as defendant, who, she told police, "could have shot" Kuka, and was named "Jamal." She was scared when she made this statement that she might be required to

testify, so she did not tell police she was "one hundred percent" sure of her two identifications, although she was that sure at the time.  She did not mean for her identification to "come out" so uncertain, but was scared that if she identified defendant, she would "be sitting here," and "would have to face him and say, 'I seen you.  This is the person I seen shot [Kuka].' "  Asked what she feared was going to happen if she testified, she said, "Just people who are probably related to [defendant], or friends with him, you know.  They're—they want to support him.  And I'm just—I was scared.  I don't know.  Maybe revenge on me, or my family."

Some months later, Lualemaga said, she happened to see defendant in an episode of a television show called "I Love New York."  The parties stipulated that defendant was in such an episode, which aired in October 2007.

Defendant was not arrested until October 2008.  Before the May 2009 preliminary hearing, Lualemaga testified, prosecutor Eric Fleming showed her a photograph, apparently of the mug shots that were on the wall of the room police took her to on the night of the shooting.  She noticed a shot of defendant was directly above Bradley's, and one of another brother, David Trulove was also visible.  She had not noticed them or identified them to police the night of the shooting, although she spent about two hours in the room.  She had not looked at every mug shot on the wall that night.  When asked why she did not notice defendant's photograph that night, she said, "I don't know.  I just—that night only [Bradley's] stuck out to me."  She said defendant looked different in the photograph than he did the night of the incident.  She said, "He looks younger; the hair is different.  He just—this looks like an old photo.  [¶]  You would really have to look at it, to know it was him.  When I walked up, I kind of briefly scanned through the pictures.  I don't know.  For some reason, [Bradley's] picture stood out."

Lualemaga testified that the photograph of defendant that police showed her at her work place the next day was the same one that was on the wall of the room.  The parties stipulated that it was taken in 2003, and that defendant was arrested and convicted of felony receipt of stolen property that year.

6

Lualemaga also testified that she had lied at the preliminary hearing when she said she did not talk to anyone about the shooting between July 23 and July 25, 2007, because she did not want to point out any family members who were in the courtroom. In fact, she had spoken to her cousin, who was present at the hearing.

Lualemaga also testified further about her fears and entry into the witness protection program. She testified that she moved out of her grandmother's Blythedale apartment in August 2008, but that members of her family continued to live there when she learned she had to testify at the May 2009 preliminary hearing. She testified, without objection by defense counsel, that she was "terrified" that she would have to do so. She was scared to sit in court and say, " 'I saw you shoot [Kuka].' " She was afraid that "[s]omething bad might happen, because I'm sitting here scared for my life, for my family's life."

Lualemaga said she discussed her fears with a prosecutor, Fleming, before the preliminary hearing. He told her about the witness protection program,[2] which she decided to enter. She discussed the hardships she endured in the program, including that she, her husband, and their one year old child moved into one hotel, then another, and then into another location; she gave birth to a new baby; and they were not permitted to see other family members. The record indicates she became emotional in discussing these hardships. They remained in the program at the time of trial; Lualemaga's sister and her family had also been relocated in the program at Lualemaga's request. Lualemaga received $875 per month for meals, and between $1,350 and $2,500 per month for lodging and storage fees. She said she was testifying at the trial in order to do what was right.

### The Testimony of Assistant Medical Examiner Ellen Moffatt

Assistant San Francisco Medical Examiner Ellen Moffatt, who performed an autopsy of Kuka's body, testified that the cause of death was multiple gunshot wounds. Kuka's body had 16 gunshot wounds, including entrance and exit wounds, from nine

---

[2] The program was referred to at trial as the "witness relocation program" and the "witness protection program." We refer to it as the latter for consistency's sake.

bullets. Five bullets entered the back of the head. One entered the right side of the head and exited the neck, and others entered the right back and lower right back. Two entrance wounds had stippling around them, which indicated they were inflicted at close range. Moffatt opined that the wounds in the back were probably inflicted before the wounds to the head because the latter would be more quickly fatal.

### *The Testimony of Officer Jim Trail*

Officer Jim Trail of the San Francisco Police Department testified, among other things, that as a result of his work at Sunnydale, he had known defendant for years. He saw him with Kuka a couple of times a week around Blythedale Avenue. Trail also saw defendant's brother, Bradley, there.

### *Other Evidence*

An investigating police inspector testified that, according to his measurements, the distances from the window where Lualemaga saw the shooting to the sidewalk below, the base of the light pole, and the knee of Kuka's body as found were 23 feet, 28 feet, 7 inches, and 37 feet, 2 inches respectively.

The inspector also testified that the lighting at the scene was good, photos taken with a flash made the area look darker than it really was, and faces could be recognized in the available lighting. Called by the defense to authenticate a DVD video of the crime scene, he said the video did not accurately portray the lighting conditions, the area was "very well lit," and he repeatedly recognized the faces of the many officers at the scene.

Moffatt, who had first observed the body at the scene of the shooting, testified that it was "fairly dark" there and it would not have been easy to see faces clearly beyond 10 or 15 feet. The next day, she testified that she had visited the scene the night before and saw a light post there, but could not recall if it was there on the night of the shooting, when she was focused on Kuka's body.

The investigating inspector testified that he found eight spent cartridge casings and a live round at the scene, as well as a deformed bullet. A police department criminalist testified that seven of the spent cartridge casings (the eighth was missing) were fired from the same firearm, a semiautomatic pistol. He could not determine if the unfired cartridge

8

was ejected from the same pistol, but all were nine-millimeter Luger ammunition. The deformed bullet was of a .380 automatic or nine-millimeter caliber.

The criminalist also testified that the operator of a typical semiautomatic pistol loads a live cartridge into the pistol's single chamber by pulling a slide back and letting it drop forward, known as "charging" the weapon. Each time the trigger is pulled, a bullet is fired, the spent cartridge casing is ejected from the pistol, and another cartridge is loaded into the chamber. If the operator charges a pistol with a live cartridge already in the chamber, that cartridge is ejected from the firearm. Thus, if the police found an unspent cartridge on the ground of a crime scene, one explanation would be that the operator charged the weapon while the cartridge was in the chamber.

### *Defendant's Case*

### *The Testimony of Dr. Geoffrey Loftus*

Defendant presented the testimony of Dr. Geoffrey Loftus, an expert in memory and perception. Loftus testified that a witness to an event takes in jumbled bits of information and that memory can change over time as "post-event" information is received from other sources or because a witness infers things in an effort to make sense of the event.

According to Loftus, memory can become inaccurate for multiple reasons. There can be problems witnessing the event, such as a lack of enough light or time to observe the event, diverted attention, or being too far away. Witnesses tend to fill in missing details in events with low lighting, can usually observe only one thing at a time, and their recall ability can be affected by stress and fear. The length of the retention interval and the possibility of receiving "post-event" information can affect accuracy, as can the process of retrieving information from memory, such as to respond to leading or biased questions.

Loftus further testified that the circumstances in which photo lineups are shown can affect a witness's memory of an event. An investigator can consciously or unconsciously influence a witness when a photo lineup is not "double-blind" so that neither knows who is suspected. A photo lineup should not include more than one

9

suspect because this increases the chances that a person will choose a suspect. Also, confirming to witnesses that the right choice has been made, even when it has not, can cause them to believe they made the right choice and that conditions of observation were better than they were.

Defense counsel gave Loftus a hypothetical based upon the facts of Lualemaga's observations. Loftus observed that, based on the distances traveled by the participants in the hypothetical incident, it lasted between 1.3 and 5 seconds, a very short time to observe an event. The collision between the victim and the shooter would have drawn the witness's attention, a shift of attention that would take one and a half seconds. Also, the problems caused by the darkness could not be compensated by additional time. Loftus concluded, "All in all, this is a set of circumstances that will be very poor for the witness's ability to accurately perceive and memorize what the shooter looked like." He also opined that while a 23-foot distance would not inhibit perception in daylight viewing, under nighttime viewing, it would have "in and of itself, a significant effect on a witness's ability to make out fine detail corresponding to facial appearance."

Loftus acknowledged it was easier to recognize the face of someone that you know. However, he said, that part of the brain that recognizes faces requires the witness to observe the entire face, and does not work well if part of the face is hidden or the lighting is not good. In poor viewing conditions, it would not really matter if the witness knew the person. Accurately recognizing the person would be difficult or impossible.

### The Testimony of Defense Investigator Kenneth Heriot

Defense Investigator Kenneth Heriot testified that he looked out Lualemaga's bedroom window, both in the day and at night, and observed that she would have to move over to the left side of the window to look up the avenue. Also, at the time of the shooting, the entire bottom panel of the window was covered with a board. When he looked out of the window at night, "it was dark," but he acknowledged a streetlight in the area cast light down on the sidewalk beneath it.

10

### *Closing Argument*

We further discuss the prosecutor's closing argument in addressing defendant's claims of prosecutorial misconduct. Therefore, we only briefly summarize it here. She began by urging the jury to rely on the testimony of a single witness as the law allows, giving examples of crimes that might go unpunished if juries did not do so. She repeatedly emphasized the courage of Lualemaga for coming forward despite her considerable fears, the danger she faced by doing so, and the hardships she endured in the witness protection program. The prosecutor argued that for her to do so, Lualemaga must be sure of her testimony and should be considered credible. The prosecutor also reviewed the other evidence of the shooting and urged the jury to review the evidence carefully as well. She argued there was sufficient evidence to find defendant guilty of first degree murder.

Defense counsel argued the incident happened very quickly and that Lualemaga's account did not make sense. He noted that she did not point out defendant from the photos on the wall of the police station on the night of the shooting, although she sat there for two to three hours, gave an uncertain identification of defendant the following day, and did not positively identify defendant until the preliminary hearing in May 2009. He argued that she received "post-event" information about defendant being charged that made her identification more certain.

Defense counsel argued Lualemaga was not credible. She had viewed the incident, which had occurred very quickly, on a dark night, and had given only a vague and conclusory description of defendant. Counsel questioned if Lualemaga could have seen the shooter's face under the circumstances. She lied in the preliminary hearing about talking to her cousin, and gave different accounts about whether she recalled if defendant's hooded sweater was up or down. She was extremely emotional, had a relationship with the government, came from a close family that grieved the loss of Kuka, and could have erred in making a cross-racial identification, a subject testified to by Loftus. While she may have felt like she was doing the "right thing," he said, that did not mean she was telling the truth, was accurate, or "got it right."

11

Defense counsel also discussed the physical evidence. He emphasized that the live cartridge was found in the middle of the street, away from where Lualemaga said she saw defendant, indicating someone else charged the weapon there, then caught up to Kuka, and shot him. He suggested the person who was knocked down moved closer to a building and out of Lualemaga's sight.

### The Verdict, Motion for New Trial, Sentence, and Appeal

The jury deliberated for four days. It requested read-backs of Lualemaga's testimony. It also requested further instruction on whether first degree murder required that the act be willful, deliberate, and premeditated before the first shot was fired, or whether it could become willful, deliberate, and premeditated with any subsequent shot, which the trial court provided. An hour later, the jury reached a verdict. It found defendant guilty of first degree murder, found true the allegation that he had personally and intentionally discharged a firearm in its commission, and found him guilty of being a felon in possession of a firearm.

Defendant moved for a new trial based on purported trial errors, prosecutorial misconduct, and newly discovered exculpatory evidence, that being the recollections of two newly discovered witnesses. The trial court rejected the claims of trial errors and prosecutorial misconduct. It heard the testimony of the two witnesses, found the testimony was not credible, and denied the motion.

The trial court sentenced defendant to a total of 50 years to life imprisonment, with possibility of parole, including 25 years to life for his conviction on count one for first degree murder, a two-year term to run concurrent for his conviction on count two for being a felon in possession of a firearm, and an additional 25 years to life to run consecutively for the enhancement allegation that he had personally and intentionally discharged a firearm in the commission of the murder.

This timely appeal followed. After oral argument, defendant filed a petition for writ of habeas corpus on August 2, 2013, in case No. A139377. He has asked that we consider this petition with his appeal. We decline to do so.

12

As we have indicated, after we issued our previous unpublished opinion, we granted defendant's petition for rehearing and received additional briefing from the parties. We have also considered an amicus curiae brief filed by the Northern California Innocence Project on defendant's behalf.

## DISCUSSION

We conclude the prosecutor committed highly prejudicial misconduct. The People's case turned on whether the jury believed Lualemaga's testimony that defendant was the shooter, despite her changing account. To persuade the jury, the prosecutor argued not only that Lualemaga had courageously testified despite not only her fears, which was a fair comment on admissible evidence, but also despite the danger of retaliation from defendant's friends and family, which caused her and family members to enter an onerous witness protection program. Reading her statements as a whole, the prosecutor argued that only a witness sure of what she saw would risk her life and others, and endure such hardships, to testify against a defendant whose friends and family could kill her for doing so; the prosecutor urged the jury to follow Lualemaga's brave example and find defendant guilty. These arguments, which were unsupported by any evidence, were highly prejudicial because they indicated defendant had a consciousness of guilt. Also, when combined with Lualemaga's testimony that the district attorney's office arranged for her and family members to enter the witness protection program, they suggested the prosecutor knew more than the information disclosed at trial. Therefore, they infected the trial with a fundamental unfairness. Although defendant has forfeited this claim because of his trial counsel's inaction, we conclude he received ineffective assistance of counsel, requiring reversal.

We reject defendant's argument that the information should be dismissed because he was denied his right to a fair preliminary hearing. We do not determine defendant's other claims of prosecutorial misconduct or of other error.[3]

---

[3] Specifically, we do not address defendant's claims that the trial court improperly denied his motion for a new trial based on newly discovered evidence, failed in its duty to give certain jury instructions sua sponte, and erroneously admitted evidence of

We note the disappointing failure of the People to address a number of defendant's arguments, even after being given the opportunity to provide supplemental briefing. Defendant argues we should take this silence as a concession that these arguments cannot be rebutted, pursuant to *Gonzalez-Servin v. Ford Motor Co.* (7th Cir. 2011) 662 F.3d 931, 933-934. We decline to do so because "on appeal a judgment is presumed correct, and a party attacking the judgment, or any part of it, must affirmatively demonstrate prejudicial error." (*People v. Garza* (2005) 35 Cal.4th 866, 881.) Therefore, we have examined the persuasiveness of defendant's appellate arguments throughout.

## I. *Prosecutorial Misconduct*

### A. *Forfeiture*

The People argue defendant has forfeited his prosecutorial misconduct claims by his trial counsel's failure to take action below. Defendant disagrees, arguing that his trial counsel raised sufficient objections to preserve them. We agree with the People.

#### 1. *Relevant Proceedings Below*

Prior to trial, defense counsel objected for lack of relevance to the introduction of evidence about Lualemaga being relocated and receiving assistance, such as rent, from the district attorney's "Victim Witness Assistance Program." He conceded that Lualemaga could testify that she had previously denied speaking to others about the crime for fear those people might become involved in the process, but objected on foundation and hearsay grounds to the admission of evidence that other people were in fear of coming forward.

The prosecutor argued that Lualemaga's fear about, and attitude towards, testifying was clearly relevant to her credibility, as was her relocation and the effect this had on her and her attitude about testifying.

---

Lualemaga's fears and the witness protection program. We also do not address his claim that the evidence was insufficient to support defendant's first degree murder conviction, other than in our analysis of the prejudice caused by the prosecutorial misconduct.

The court ruled that Lualemaga could talk about her own attitude towards testifying and relocation, but not about anyone else's fear.  Also, defense counsel could cross-examine on the financial assistance provided to Lualemaga.

As we have discussed, Lualemaga testified about her fears and her experiences in the witness protection program.  The prosecutor also asked her who had recently lived in her former bedroom.  Over two defense objections based on relevance and a third that was unspecified, Lualemaga was permitted to testify that her sister had lived there, that Lualemaga had feared for her safety if Lualemaga were to testify at trial, and that the prosecutor, at Lualemaga's request, had arranged to relocate the sister and her family to a safe place.

Later in the trial, the prosecution objected to providing the defense with additional documentation about the benefits Lualemaga had received in the witness protection program.  After conducting an in camera review, the court ruled that the prosecution was not required to provide the documentation because the revelation of details would create a potential risk to Lualemaga and was not necessary for impeachment purposes.  The court allowed a defense inquiry that was limited "to the amounts and the specific purposes [for] those amounts and time frames for the amounts."

As we will further discuss, in closing argument, the prosecutor made a number of improper statements in urging the jury to rely on Lualemaga's identification of defendant as the shooter.  Defense counsel did not object to any of the prosecutor's statements, with one exception late in rebuttal that is not relevant to our analysis here,[4] nor did he ask for any related admonitions or limiting instructions to the jury.

### 2. *Analysis*

As the People point out, our Supreme Court has held that, when a defendant does not object to remarks in closing argument claimed to be prosecutorial misconduct,

---

[4]  Defense counsel objected when the prosecutor, after stating that Lualemaga's life was priceless to her, asked the jury, "What is your life worth to you?  What would you risk your life for?"  Defense counsel stated that the argument appealed to jurors personally, and the trial court sustained the objection on that ground.

15

"defendant is deemed to have waived the objection and the point cannot be raised on appeal. [Citations.] The reason for this rule, of course, is that 'the trial court should be given an opportunity to correct the abuse and thus, if possible, prevent by suitable instructions the harmful effect upon the minds of the jury.' " (*People v. Green* (1980) 27 Cal.3d 1, 27 (*Green*), overruled on other grounds in *People v. Martinez* (1999) 20 Cal.4th 225, 233-237 and *People v. Hall* (1986) 41 Cal.3d 826, 834, fn. 3.) Thus, "a claim of prosecutorial misconduct is not preserved for appeal if defendant fails to object and seek an admonition if an objection and jury admonition would have cured the injury." (*People v. Crew* (2003) 31 Cal.4th 822, 839.)

Defendant argues that he preserved his claims via his motion in limine to bar evidence of Lualemaga's participation in the witness protection program, his objection at trial to evidence about Lualemaga's sister's participation in the witness protection program, and his objection to the prosecutor withholding documents regarding the details of program payments to Lualemaga. He cites to *People v. Hill* (1998) 17 Cal.4th 800 (*Hill*), which provides that "[a] defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile," that a failure to require the jury be admonished does not forfeit the issue on appeal "if ' "an admonition would not have cured the harm caused by the misconduct," ' " and that "the absence of a request for a curative admonition does not forfeit the issue for appeal if 'the court immediately overrules an objection to alleged prosecutorial misconduct [and as a consequence] the defendant has no opportunity to make such a request.' " (*Id.* at pp. 820-821, quoting *Green*, *supra*, 27 Cal.3d at p. 35, fn. 19.)

Defendant's preservation argument is unpersuasive. His claims that the prosecutor engaged in misconduct in closing argument were not a subject of defendant's motion in limine or the other objections cited. Also, timely objections and requests for admonitions, and/or limiting instructions, could have cured the harm done by the

prosecutor's improper arguments.  Therefore, defendant has forfeited his appellate claims of prosecutorial misconduct.[5]

## B.  *The Prosecutor's Prejudicial Misconduct By Referring to Facts Not in Evidence*

We agree with defendant that the prosecutor repeatedly engaged in prejudicial misconduct when she urged the jury to believe Lualemaga because Lualemaga testified in the face of real danger of retaliation from defendant's friends and family, and endured hardships in a witness protection program that this danger compelled her and others to enter, when there was no evidence of such danger.

" 'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' " (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305.)  Also, " ' "when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' " (*People v. Ayala* (2000) 23 Cal.4th 225, 283-284.)

Generally, " ' " 'a prosecutor is given wide latitude during argument.  The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.' " ' " (*Hill*, *supra*, 17 Cal.4th at p. 819.)  Also, although a defendant may "single[] out words and phrases, or at most a few sentences, to demonstrate misconduct, we must view the

---

[5]  Defendant also argues that the trial court had a duty to rein in continued misconduct even absent adequate objection based on a citation to *People v. Vance* (2010) 188 Cal.App.4th 1182, 1201-1202, a decision issued by this court.  This argument is unpersuasive because, as the discussion in *Vance* indicates, we found the trial court failed in its duty to admonish the jury in the face of repeated objections by the defense, which the court sustained.  (*Ibid.*)

17

statements in the context of the argument as a whole." (*People v. Dennis* (1998) 17 Cal.4th 468, 522.)

However, a prosecutor's reference to facts not in evidence is " 'clearly misconduct' [citation], because such statements 'tend[] to make the prosecutor his own witness—offering unsworn testimony not subject to cross-examination. . . ." [Citations.]' [Citations]. 'Statements of supposed facts not in evidence . . . are a highly prejudicial form of misconduct, and a frequent basis for reversal.' " (*Hill*, *supra,* 17 Cal.4th at p. 828.) "A prosecutor's 'vigorous' presentation of facts favorable to his or her side 'does not excuse either deliberate or mistaken misstatements of fact.' " (*Id.* at p. 823.) "[T]he prosecutor has a special obligation to avoid 'improper suggestions, insinuations, and especially assertions of personal knowledge.' " (*United States v. Roberts* (9th Cir. 1980) 618 F.2d 530, 533, quoting *Berger v. United States* (1935) 295 U.S. 78, 88.)

A prosecutor is specifically " 'prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record.' " (*People v. Turner* (2004) 34 Cal.4th 406, 432-433 (*Turner*).) "It is improper for a prosecutor to offer assurances that a witness is credible or to suggest that evidence available to the government but not before the jury corroborates the testimony of a witness. [Citations.] In either case, prosecutorial comments may be understood by jurors to permit them to avoid independently assessing witness credibility and to rely on the government's view of the evidence." (*People v. Cook* (2006) 39 Cal.4th 566, 593.) Such prohibitions are particularly important regarding prosecution references to threats to a witness because of the highly prejudicial subject matter; "evidence that a defendant is threatening witnesses implies a consciousness of guilt and thus is *highly prejudicial* and admissible only if adequately substantiated." (*People v. Warren* (1988) 45 Cal.3d 471, 481, italics added.)

Defendant contends the prosecutor made a number of statements to the jury that indicated the danger to Lualemaga was real, a fact not in evidence. For example, he cites the prosecutor's remark that "[Lualemaga] was the only witness willing to . . . walk in here, *risk her life*, and tell you what she saw" (italics added), and other similar remarks.

18

The People argue the prosecutor made the remarks in dispute to explain "why Lualemaga was not one hundred percent sure of her identification of [defendant] as the shooter when she talked to the police, but was one hundred percent sure at trial," as well as to explain Lualemaga's attitude towards testifying, particularly her fears about her own life and those of her family, her sister, and her sister's family. Thus, when the prosecutor said Lualemaga had risked her life and the lives of the others by coming forward as a witness, she "was telling the jury that there was no good reason for the witness to come forward unless she was telling the truth. Experiencing the fear of risking lives was not a good reason to be a witness. Whether expressed as fear or risk, the concept was clearly what the evidence showed." Therefore, there was no misconduct.

The prosecutor did urge the jury to believe Lualemaga because she testified despite her fears. For example, she stated early in her closing argument, "[Lualemaga] was terrified to do what she did, but she did it anyway. . . . She told you how terrified she was. [¶] She's afraid for her life, she's afraid for her family's life, afraid for her sister's life. She will never get her life back. [¶] In one day of testimony, she has shown more courage and more character than most people can ever expect to do in a lifetime." Later, talking about placing Lualemaga and her family in the witness protection program, the prosecutor said, "You have to put them where nobody can find them. That's the only way that she can feel safe, she can feel safe from revenge and retaliation. That's what she feared most."

Evidence of such fears, including of retaliation, is admissible to evaluate that witness's credibility pursuant to Evidence Code section 780. " 'Testimony a witness is fearful of retaliation similarly relates to that witness's credibility and is also admissible. [Citation.] It is not necessary to show threats against the witness were made by the defendant personally, or the witness's fear of retaliation is directly linked to the defendant

19

for the evidence to be admissible.' " (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1368.) The prosecutor's statements were a fair comment on this evidence.[6]

However, the prosecutor did not stop there. Although she did not declare outright that Lualemaga was in actual danger of retaliation from defendant, his family, or his friends, she made numerous statements indicating that was the case.

First, the prosecutor reminded the jury that Lualemaga was terrified about testifying specifically because of her fear of retaliation from defendant's friends and family. She stated that Lualemaga did not "want to be sitting there where everybody could see her, where there's an open courtroom that could be full of the defendant's friends and family all going to know she's the one."

The prosecutor followed this with statements that indicated Lualemaga was in real danger. The prosecutor said: "She's the only one standing between him and justice, because she's the only witness. So we move her into a hotel. *And we put her in a safe place,* so she didn't feel vulnerable." (Italics added.) She also said, after describing some of the hardships Lualemaga experienced in the witness protection program: "How sure would you have to be of what you saw if that was *the price* of being a witness?" (Italics added.) Similarly, in explaining Lualemaga's concealment of her conversation with her cousin, the prosecutor noted several hardships Lualemaga experienced in the witness protection program and said, "She doesn't want her cousin to *have* to go through that. . . . She lied *to protect* her cousin, so her cousin wouldn't *have* to suffer what she was going through." (Italics added.) These statements indicated Lualemaga was moved from an unsafe place to a safe place in a program she was required to enter in the face of

---

[6] For these reasons, we reject defendant's additional argument that the prosecutor's misconduct exacerbated the trial court's erroneous, unconstitutional admission of evidence of Lualemaga's fears and the witness protection program. Assuming for argument's sake that defendant did not forfeit this claim as the People contend, it is unpersuasive because of the highly probative nature of this evidence. Lualemaga's account was the sole evidence placing defendant at the scene, and changed over time. Her testimony about her fears and the witness protection program was critical to the jury's evaluation of her credibility and, therefore, to the outcome of the case.

real danger of retaliation.  However, the only pertinent evidence was that Lualemaga had voluntarily entered the program solely because of her own general fears.

The prosecutor then proceeded to argue again and again that Lualemaga should be believed because she had knowingly risked her life and faced the danger of retaliation in order to testify against defendant.  She said to the jury at various points:  "How sure would someone have to be to risk her life?"  "How sure would you have to be to put your life in peril?"  "How sure would you have to be to know that, because of what you're doing, because you're standing up and doing the only thing that's right; that is, pointing out the defendant as a murderer, how sure would you have to be before you would risk your life on it?"  "How sure would you have to be to risk your sister's life?"  "Is it so unreasonable that somebody who is now afraid she's going to have to testify and expose herself to retaliation, maybe get killed over being a witness because she saw someone else kill someone, is it so unreasonable to think that she's going to hesitate?"  As part of her final summation, the prosecutor referred to Lualemaga coming forward and said, "What would people give up?  What would people risk their life for? . . .  If someone's life depended on the decision, how sure would that person have to be?  [¶]  You can't underestimate the sacrifice that [Lualemaga] has made, just to do the right thing."  A short time later, she said, "Nobody knowing what [Lualemaga] has sacrificed just to come in here and tell you what she saw would think she was mistaken."

At times, the prosecutor made these statements alongside references to Lualemaga's fears.  For example, along with referring to Lualemaga's sacrifices in the quote directly above, the prosecutor stated, "The more scared she gets, the more certain she has to be."  These additional references, however, did not cure the damage done by the prosecutor's numerous indications that Lualemaga actually faced a real danger of retaliation, and that the danger was so substantial that she was required to enter the witness protection program.  The prosecutor made no effort to qualify her many references as being only to those risks and dangers the fearful Lualemaga believed to exist.  Instead, the prosecutor argued repeatedly that Lualemaga should be believed for two reasons:  because she testified despite her fears, and, *furthermore*, because she risked

21

her life and others, and endured hardships, to testify in the face of danger of retaliation from defendant's friends and family. As the prosecutor summed up Lualemaga's circumstances: "All of this danger, all of her fears." (Italics added.) The prosecutor repeatedly crossed over the boundary of proper argument.

To make matters worse, the prosecutor used Lualemaga's willingness to testify in the face of this purportedly real danger for an additional purpose. After praising Lualemaga's courage in coming forward despite the sacrifices, risks, and fears referred to, the prosecutor ended her rebuttal argument by stating, "Now I'm asking you to have the same courage that [Lualemaga] did and convict the defendant of murder." In other words, the prosecutor relied on facts not in evidence to directly implore the jury to find defendant guilty.

The People did not present a scintilla of evidence at trial that defendant's friends and family would try to kill Lualemaga if she testified against him, nor that Lualemaga was placed in the witness protection program for any reason other than Lualemaga's subjective concerns about her safety.[7] Rather than concede Lualemaga's fears were just that, however, the People trumpeted her courageous willingness to testify in the face of assassins lurking on defendant's behalf. This yarn was made out of whole cloth. Because the heavy emphasis the prosecutor repeatedly placed on the asserted dangers Lualemaga faced by testifying against defendant must have influenced the jury, and such dangers were not based on any evidence, the prosecutor's argument to the jury was prejudicial prosecutorial misconduct under both the federal and state standard. (See *Hill*, *supra,* 17 Cal.4th at pp. 828, 845 [referring to an "onslaught" of misconduct that made it difficult for the jury to remain impartial]; *United States v. Roberts*, *supra*, 618 F.2d at pp.

_____

[7] At best, it can be reasonably inferred from the fact that no one other than Lualemaga came forward before trial that there might have been some danger involved in doing so; testimony by her and investigating police suggest a couple of dozen others were in the area at the time of the shooting. However, it *cannot* be reasonably inferred that any such danger came from defendant. There are a multitude of reasons why someone might be afraid to come forward, including that they saw someone else shoot Kuka and feared retaliation from that person, feared becoming involved at all, and/or did not trust the authorities.

533-535 [finding misconduct when the prosecutor vouched for the key witness's credibility by referring to facts outside the record].)

When prosecutorial misconduct occurs, an appellate court must determine whether there was sufficient prejudice to require reversal under the federal standard articulated in *Chapman v. California* (1967) 386 U.S. 18, 24 and/or the state standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Adanandus* (2007) 157 Cal.App.4th 496, 514.) We conclude there was sufficient prejudice. This misconduct was not harmless beyond a reasonable doubt. To the contrary, as we discuss in our ineffective assistance of counsel analysis directly below, it is reasonably probable that, but for this misconduct and defense counsel's inaction, the result would have been more favorable to defendant.

## C. *Ineffective Assistance of Counsel*

We agree with defendant that he received ineffective assistance of counsel because his trial counsel did not object to any of the statements we have discussed, nor ask the court to give any related admonitions or limiting instructions to the jury.

To establish such a claim by direct appeal, a "defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it 'fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms.' [Citations.] Unless a defendant establishes the contrary, we shall presume that 'counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.' [Citation.] If the record 'sheds no light on why counsel acted or failed to act in the manner challenged,' an appellate claim of ineffective assistance of counsel must be rejected 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' [Citations.] If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (*People v. Ledesma* (2006) 39 Cal.4th 641, 745-746.)

As we have discussed, the prosecutor's prejudicial misconduct was integral to the prosecutor's closing argument and about the jury's evaluation of the credibility of Lualemaga's testimony, upon which the case turned. Under these circumstances, defendant's trial counsel's performance was deficient, and there simply can be no satisfactory explanation for his failure to object or otherwise act to alleviate the prejudice caused by the prosecutor's improper arguments. Therefore, defendant received ineffective assistance of counsel. (See *People v. Anzalone* (2006) 141 Cal.App.4th 380, 395-396 [finding ineffective assistance of counsel for trial counsel's failure to object to the prosecutor's misstatements of the law as to three attempted murder counts].)

The People do not address this ineffective assistance of counsel argument, part of their disappointing failure to address a number of defendant's arguments. They do argue that, assuming prosecutorial misconduct occurred, it was not prejudicial because the jury was properly instructed that closing argument is not evidence and is presumed to have followed this instruction. (*People v. Holt* (1997) 15 Cal.4th 619, 662.). We disagree. The prosecutor, unchecked by any defense objection or other action, encouraged the jury again and again to believe that Lualemaga faced a real, life-threatening danger of retaliation from defendant's friends and family, highly prejudicial subject matter. (*Hill*, *supra*, 17 Cal.4th at p. 828 [referring to facts not in evidence " 'a highly prejudicial form of misconduct' "]; *People v. Warren*, *supra*, 45 Cal.3d at p. 481 [evidence that a defendant is threatening a witness is "highly prejudicial"].) She indicated Lualemaga was placed in a witness protection program by her own office because of this supposed danger, circumstances suggesting she had special knowledge that added weight to her assertions. Her improper arguments may well have influenced the jury to think defendant was an especially dangerous person who deserved the maximum conviction allowed by law, even if the jury was instructed that these arguments were not evidence.

The People also argue a lack of prejudice because the evidence of defendant's guilt was overwhelming. The only evidence they cite is Lualemaga's testimony, which, the People note, the trial court said was "very compelling and very credible" in rejecting defendant's new trial motion. Given that Lualemaga's uncorroborated account changed

24

over time and was the subject of prosecutor's improper arguments, her testimony was not so overwhelming as to render harmless the prejudice caused by the prosecutor's misconduct. The court's posttrial evaluation of Lualemaga's credibility is not particularly relevant to whether the jury was prejudicially influenced. We conclude this was the case. The most obvious indication of it is the jury's return of a verdict of murder in the first degree, after four days of deliberation and shortly after it asked the court about the legal standards for first degree murder, when there was no substantial evidence to support conviction of that offense.

A first degree murder conviction such as defendant's must be based on more than evidence of the willful intent to kill; there must also be evidence beyond a reasonable doubt that defendant acted with premeditation and deliberation. (§ 189; see *People v. Bolin* (1998) 18 Cal.4th 297, 331.) Typically, the manner of killing does not alone establish first degree murder. "It is well established that the brutality of a killing cannot in itself support a finding that the killer acted with premeditation and deliberation. 'If the evidence showed no more than the infliction of multiple acts of violence on the victim, it would not be sufficient to show that the killing was the result of careful thought and weighing of considerations.' " (*People v. Anderson* (1968) 70 Cal.2d 15, 24-25.)

Lualemaga's sparse testimony was the only account presented at trial about defendant's conduct prior to and during the shooting. She said defendant was friends with Kuka, and present outside her building drinking with him and Bradley around 3:00 p.m. on the day of shooting. When Lualemaga looked out her bedroom window around 11:00 p.m. that night, she first saw defendant by her parked car when Kuka bumped into him as defendant "was kind of in his way." Kuka elbowed defendant "really hard" with his right arm, causing defendant to fall down, and then ran down a hill after Bradley. Lualemaga did not indicate defendant was holding a pistol when he first appeared, or took any aggressive action towards Kuka before being knocked down. While one could speculate about defendant's appearance, no juror could reasonably conclude beyond a reasonable doubt that defendant's appearance on the scene indicated any planning or motive to kill Kuka.

Indeed, the People do not point to any specific, substantial evidence of planning. One could point to the evidence that defendant arrived at the scene with a loaded pistol. However, without any evidence explaining why he did so, no juror could reasonably conclude beyond a reasonable doubt that he planned to kill Kuka when he arrived. This would be mere speculation.

As for motive, a juror could reasonably infer that defendant, after appearing by Lualemaga's car, reacted to Kuka's chasing defendant's brother and elbowing defendant hard to the ground. However, one cannot reasonably conclude this showed premeditation or planning, given the rest of Lualemaga's testimony. Lualemaga said defendant got up "fast" and ran after Kuka, shooting him multiple times in rapid succession when he caught up to him.

In addition, defense expert Loftus, testifying about a hypothetical based on the incident, estimated a shooter running fast, as Lualemaga testified defendant had done, caught up to the victim in about 1.3 seconds (and about 5 seconds if walking), based on the approximately 29 feet between the point of the initial collision and the location of the victim's body. The prosecution did not attempt to rebut this estimate.

Given the undisputed evidence of the events before and during the shooting, a juror could not reasonably conclude that defendant premeditated or deliberated about killing Kuka between the time he encountered Kuka and shot him. Although case law cautions that one can reach a premeditated and deliberate decision to kill quickly (*People v. Bolin*, *supra*, 18 Cal.4th at p. 332), the particular circumstances before us indicate that a few seconds, at most, elapsed between the time defendant was elbowed to the ground and began shooting Kuka. Also, they indicate defendant was elbowed hard, knocked down, got up, chased after Kuka, and prepared to shoot him in these few seconds, significant indications defendant did not engage in any reflection or careful consideration of his actions during this short period of time. And even if the jury relied on defendant's decision to repeatedly shoot Kuka in the head after his initial shots knocked Kuka to the ground, there is no evidence defendant paused in any meaningful way between his first and last shot; to the contrary, Lualemaga's testimony indicates he did not pause at all.

26

We are left, then, with the evidence that defendant shot Kuka nine times in rapid succession, including six shots in the head that, according to Moffatt, probably came after he shot Kuka three shots in the back and neck. Certainly, the nature of this shooting indicates defendant intended to kill Kuka. However, we fail to see how a juror could reasonably conclude beyond a reasonable doubt that these multiple shots, including those aimed precisely at the head, alone prove premeditation and deliberation, since neither "the brutality of a killing" and " 'the infliction of multiple acts of violence' " on a victim are sufficient to show that the killing was the result of careful thought and weighing of considerations. (*People v. Anderson*, *supra*, 70 Cal.2d at pp. 24-25.)

We conclude that the jury reached this erroneous verdict at least in significant part because of the prosecutor's highly prejudicial misconduct in closing argument and defendant's trial counsel's failure to take any action regarding it.[8] Therefore, there was a reasonable probability that, but for the ineffective assistance of counsel, the trial result would have been more favorable to defendant.

## II. *The Court's Denial of Motion to Dismiss for Untimely Discovery*

Defendant also argues the trial court erred in denying his pretrial motion to dismiss the case based on the purported violation of his right to a fair preliminary hearing. Defendant argues this requires that we order dismissal of the information, regardless of whether or not we reverse the judgment. We disagree.

### A. *The Relevant Proceedings Below*

Before trial, defendant moved for dismissal of the information. He argued that, despite defense requests, the prosecution did not turn over evidence of Kuka's violent criminal history and an unredacted version of a purportedly exculpatory document until after his preliminary hearing, thereby violating his federal and state constitutional rights to due process and confrontation of witnesses, and Penal Code section 1054, et seq.

---

[8] In our previous opinion, we reduced defendant's murder conviction from first degree to second degree pursuant to sections 1181, subdivision (6) and 1260, and otherwise affirmed the judgment. We do not reduce the verdict here in light of our determination that prejudicial prosecutorial misconduct occurred, requiring reversal.

Relying heavily on *Stanton v. Superior Court* (1987) 193 Cal.App.3d 265 (*Stanton*), he argued that he was precluded from fully investigating claims of self defense, defense of others, and third party culpability, requiring dismissal.

The People opposed the motion, arguing among other things, that defendant was not entitled to the requested discovery prior to the preliminary hearing because it was not material to Lualemaga's cross-examination (identified in the hearing transcript as "Priscilla Maliolagi"), exculpatory, or otherwise relevant, and that there had been no prejudice to the defense.

After hearing, the trial court ruled that the discovery sought was relevant (apparently referring to trial), but that the failure of the prosecution to timely produce it, while negligent delay, did not violate defendant's due process rights so as to warrant dismissal under the federal Constitution. It denied the motion to dismiss, but continued the trial two weeks, and indicated that defense counsel could move to continue the trial further if he was not ready at that time. At trial, the defense did not present any evidence based on the discovery that was the subject of its pretrial motion.

B. *Analysis*

A defendant has the right to cross-examine witnesses and produce witnesses to be sworn and examined at a preliminary hearing. (*Jennings v. Superior Court* (1967) 66 Cal.2d 867, 875.) The People have a "fundamental 'duty . . . , even in the absence of a request therefor, to disclose all substantial material evidence *favorable to an accused*, whether such evidence relates directly to the question of guilt, to matters relevant to punishment, or to the credibility of a material witness.' " (*Stanton*, *supra*, 193 Cal.App.3d at p. 269.) " '[T]he suppression of substantial material evidence bearing on the credibility of a key prosecution witness is a denial of due process within the meaning of the Fourteenth Amendment.' " (*Id*. at p. 269.) The *Stanton* court determined that the procedural vehicle for setting aside an information because of a prosecution's failure prior to a preliminary hearing to disclose material evidence favorable to the accused, where the deprivation of the substantial right is not shown in the transcript of the preliminary hearing, is a pretrial nonstatutory motion to dismiss. (*Id*. at pp. 270-271.)

28

Normally, we review a trial court's denial of a motion to dismiss such as defendant's for abuse of discretion. (*Merrill v. Superior Court* (1994) 27 Cal.App.4th 1586, 1597.) However, defendant contends the trial court did not exercise its discretion and that we should conduct a de novo review pursuant to *Green*, *supra*, 27 Cal.3d at pages 24-26.

We do not necessarily agree that the trial court failed to exercise its discretion. Regardless, defendant's argument is unpersuasive under a de novo standard of review. The People presented Lualemaga as its only witness at the preliminary hearing, and she testified that she saw defendant shoot Kuka, similar to her description at trial. This was sufficient to support the information. The evidence claimed by the defendant to be material and exculpatory was neither, and it was not relevant to Lualemaga's cross-examination at the preliminary hearing. The only possible reading of the redacted portion of the notes referred to by defendant is that it is *inculpatory*, as it refers to Kuka crawling along the ground as defendant runs up and makes a negative statement about him. Defendant's contention that Kuka's criminal history was material for purposes of the preliminary hearing because it could have led to his being held on a lesser charge based upon heat of passion or self-defense is speculative and unpersuasive.

We also agree with the People that any error was not prejudicial, including under the federal standard articulated in *Chapman v. California*, *supra*, 386 U.S. at page 24, in light of the fact that the defense did not present any of the withheld discovery at trial, a telling indication that it was not exculpatory and did not lead to other exculpatory evidence.

## DISPOSITION

The judgment is reversed.

                                          _____

                                          Kline, P.J.

We concur:


_____

Haerle, J.


_____

Richman, J.